## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MICHAEL D. PAULUS,** | : |
| **Plaintiff** | : |
| | : |
| | : **3:12-CV-02122** |
| **vs.** | : |
| | : **(Judge MARIANI)** |
| **CAROLYN W. COLVIN, ACTING** | : |
| **COMMISSIONER OF SOCIAL** | : |
| **SECURITY,** | : |
| | : |
| **Defendant** | : |

### MEMORANDUM

### Background

        The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Michael D. Paulus's claim for social security disability insurance benefits and supplemental security income benefits.

        On June 29, 2009, Paulus filed protectively[1] an application for disability insurance benefits and an application for supplemental security income benefits. Tr. 12, 68-69, 212-220 and 227.[2]  The applications were initially denied by the Bureau of Disability Determination[3] on October 7, 2009. Tr. 71-79. On November 12,  2009, Paulus requested a hearing before an administrative law judge. Tr. 12 and 80-81.  After

---

1.    Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

2.    References to "Tr._" are to pages of the administrative record filed by the Defendant as part of the Answer on December 20, 2012.

3.    The Bureau of Disability Determination is a state agency which initially evaluates applications for disability insurance and supplemental security income benefits on behalf of the Social Security Administration.  Tr. 71 and 75.

over 17 months had passed, a hearing was held on April 28, 2011. Tr. 12 and 25-66.

Paulus was represented by counsel at the hearing. Id. On May 4, 2011, the

administrative law judge issued a decision denying Paulus's applications. Tr. 12-20. As

will be explained in more detail *infra* the administrative law judge found that Paulus failed

to prove that he met the requirements of a listed impairment or suffered from work-

preclusive functional limitations. Id. Instead Paulus had the ability to perform a limited

range of light work,[4] including as a conveyor line bakery worker and security system

---

4.    The terms sedentary, light, medium, heavy and very heavy work are defined in the
regulations of the Social Security Administration as follows:

> (a) *Sedentary work.* Sedentary work involves lifting no more than 10
> pounds at a time and occasionally lifting or carrying articles like docket
> files, ledgers, and small tools. Although a sedentary job is defined as one
> which involves sitting, a certain amount of walking and standing is often
> necessary in carrying out job duties. Jobs are sedentary if walking and
> standing are required occasionally and other sedentary criteria are met.

> (b) *Light work.* Light work involves lifting no more than 20 pounds at a
> time with frequent lifting or carrying of objects weighing up to 10 pounds.
> Even though the weight lifted may be very little, a job is in this category
> when it requires a good deal of walking or standing, or when it involves
> sitting most of the time with some pushing and pulling of arm or leg
> controls. To be considered capable of performing a full or wide range of
> light work, you must have the ability to do substantially all of these
> activities. If someone can do light work, we determine that he or she can
> also do sedentary work, unless there are additional limiting factors such
> as loss of fine dexterity or inability to sit for long periods of time.

> (c) *Medium work.* Medium work involves lifting no more than 50 pounds at
> a time with frequent lifting or carrying of objects weighing up to 25 pounds.
> If someone can do medium work, we determine that he or she can do
> sedentary and light work.

> (d) *Heavy work.* Heavy work involves lifting no more than 100 pounds at a
> time with frequent lifting or carrying of objects weighing up to 50 pounds.
> If someone can do heavy work, we determine that he or she can also do
> medium, light, and sedentary work.

> (e) *Very heavy work.* Very heavy work involves lifting objects weighing
> more than 100 pounds at a time with frequent lifting or carrying of objects
> weighing 50 pounds or more. If someone can do very heavy work, we
> (continued...)

2

monitor. Id. On May 20, 2011, Paulus filed a request for review with the Appeals Council. Tr. 6-8. After the passage of 16 months, the Appeals Council on September 20, 2012, concluded that there was no basis upon which to grant Paulus's request for review. Tr. 1-5. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Paulus then filed a complaint in this court on October 23, 2012. Supporting and opposing briefs were submitted and the appeal[5] became ripe for disposition on March 1, 2013, when Paulus filed a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Paulus met the insured status requirements of the Social Security Act through June 30, 2009. Tr. 12, 14, 220 and 227. In order to establish entitlement to disability insurance benefits Paulus was required to establish that he suffered from a disability on or before that date. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged,

---

4.   (...continued)
      determine that he or she can also do heavy, medium, light and sedentary
      work.

20 C.F.R. § 416.967.

5.   Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

blind or other disabled individuals who have little or no income. Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

Paulus was born in the United States on May 4, 1966, and at all times relevant to this matter was considered a "younger individual"[6] whose age would not seriously impact his ability to adjust to other work. 20 C.F.R. §§ 404.1516(c) and 416.963(c). Tr. 41, 85-86, 155 and 159.

Although Paulus withdrew from school after commencing the 10th grade, he subsequently obtained a General Equivalency Diploma (GED) in 1989 and can read, write, speak and understand the English language and perform basic mathematical function such as paying bills, counting change, handling a savings account and using a checkbook and money orders. Tr. 35, 59, 230, 235 and 248. During his elementary and secondary schooling, Paulus attended regular education classes. Tr. 235. After obtaining a GED, Paulus did not complete "any type of special job training, trade or vocational school." Id.

Paulus's work history covers 24 years and at least 16 different employers. Tr. 221-224. The records of the Social Security Administration reveal that Paulus had earnings in the years 1979 through 1980, 1983 through 1986, 1988 through 1999 and 2002 through 2007. Tr. 221. Paulus's annual earnings range from a low of $86.60 in 1979 to a high of $29,816.02 in 2003. Id. Paulus's total earnings during those 24 years were $227,549.26. Id.

6. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). At the time of the administrative hearing Paulus was 44 years old.

4

Paulus has past relevant employment[7] as (1) a dishwasher which was described by a vocational expert as unskilled, medium work, (2) a tire changer which was described as semi-skilled, heavy work, (3) a garbage collector described as unskilled, heavy work, (4) an auto mechanic helper described as semi-skilled, heavy work, and (5) a landscaping laborer described as unskilled, medium work. Tr. 59.

In a document filed in 2009 with the Social Security Administration Paulus claimed that he became disabled on June 1, 2007, because of high blood pressure, a unspecified hairline fracture and a methicillin resistant Staphylococcus aureus infection. Tr. 71, 231 and 258. Paulus claimed that he was unable to stand or sit for long periods of time. Tr. 231. At the administrative hearing Paulus alleged that his primary disabling impairment was an orthopedic issue which arose on August 12, 2010, well-after his date last insured. Tr. 28-29. In his appeal brief, Paulus contends that he has had a history of high blood pressure, a chronic herniated cervical disc, degenerative disc disease of the cervical and lumbar spine, and a staph infection. Doc. 9, Plaintiff's Brief, p. 1. Paulus claims that his medical condition has gradually worsened over time. Id. Paulus does not contend that he is disabled as the result of psychiatric impairments. Tr. 231. Paulus's last employment was as a dishwasher in 2007 for Dukes Riverside Bar & Grill, Inc. Tr. 31 and 224. He stopped working on June 1, 2007, the date he claims he became disabled. Tr. 231.

During the initial claim process, Paulus was requested to provide information regarding his functional limitations. On September 17, 2009, Paulus indicated in a document entitled "Function Report - Adult" that he lives in a house with his

7 .    Past relevant employment in the present case means work performed by Paulus during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

wife; he has no problems with personal care other than cleaning painful areas in his groin and has to be careful when using the toilet;[8] he does not prepare his own meals; he vacuums a small bathroom rug twice a week; he needs no encouragement to engage in cleaning; he goes out everyday and has his morning coffee on the porch; he can go out alone; his hobbies include taking care of his cat, playing the guitar and reading; he does not need reminders to go places; he has no problems getting along with family, friends and neighbors; and he is able to pay bills, count change, handle a savings account and use a checkbook and money orders. Tr. 246-250. Paulus when given an opportunity to do so noted no problem with standing, reaching, talking, hearing, seeing, memory, concentration, understanding, following instructions, using his hands, and getting along with others. Tr. 250.

At the administrative hearing on April 28, 2011, Paulus testified as well as Robert Good, one of Paulus's neighbors. Tr. 25-66. Paulus testified that he lived in a house with his wife in Marysville, Pennsylvania. Tr. 34-36. He stated that he had cervical spinal surgery earlier that month and that he was still in a lot of pain. Tr. 36. Paulus reported weakness and "shaking"in his right upper extremity but that he had that condition since 1991. Tr. 39. Paulus testified that after the surgery he wore a cervical collar but that it was taken off on Monday, April 25, 2011. Tr. 36. He also reported that he uses a cane with his left hand to ambulate. Tr. 38-39. He stated he could make coffee for himself; he could go up and down stairs slowly; he enjoys reading; he has a driver's license but he does not drive; he claimed that he had difficulty washing and combing his hair as well as dressing; he admitted that his right hand was a little better since the surgery but he still had numbness and tingling in the right upper extremity; and

---

8 . The record reveals that Paulus had testicular pain from, inter alia, cysts.

6

he reported that he was right-handed but that he was getting better with his left hand.  Tr.
44-47.  Mr. Good corroborated a large portion of Paulus's testimony. Tr. 49-56.  Mr.
Good testified that before the surgery Paulus would do cleaning around the house but
had to pay attention so that he would not fall down; and Paulus for a period of at least
three months had his water turned off by the water company and that he allowed Paulus
to haul water in gallon jugs from his house. Tr. 50-51.  Mr. Good testified that Paulus did
not perform yard work but when asked whether Paulus shoveled snow answered in the
affirmative and also stated that Paulus when "he knows he's going to get a lot of snow
then he's out there a couple time shoveling so it don't get so deep, you know. . . he does
take care of the snow." Tr. 52-53.

        The record reveals that Paulus has a history of  smoking ½ - 1 pack
cigarettes per day for 30 years.  Paulus continued to smoke prior to and after his cervical
spine surgery.[9]

        For the reasons set forth below we will affirm the decision of the
Commissioner.

## Standard of Review

        When considering a social security appeal, we have plenary review of all
legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social
Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec.
Admin.,  181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d

---

9.    It is reported in the medical literature that smoking is bad for patients undergoing
spinal surgery because it can cause a number of significant problems including
decreased rate of healing and success of the surgery. See, generally, Larry Davidson,
M.D., Cigarette Smoking and Its Impact on Spinal Fusions, spinuniverse,
http://www.spineuniverse.com/treatments/surgery/cigarette-smoking-its-impact-spinal-fu
sions (Last accessed April 8, 2014).

Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

8

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## Sequential Evaluation Process

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

9

42 U.S.C. § 423(d)(2)(A).

      The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims. See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[10] (2) has an impairment that is severe or a combination of impairments that is severe,[11] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[12] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the

---

10.   If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further.

11.   The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2).

12.   If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[13]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities.  Id; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**Medical Records**

Before we address the administrative law judge's decision and the arguments of counsel, we will review some of Paulus's medical records.

The first medical record that we encounter is of an initial appointment Paulus had on November 19, 2007, with Robert Matsko, M.D., of Spirit Physicians Services, Inc., located in Marysville, Pennsylvania. Tr. 304 and 315.  Paulus was a new patient of Dr. Matsko. Tr. 315.  At that appointment Paulus complained of dyspnea (shortness of breath) on exertion, chest pain and methicillin resistant Staphylococcus aureus (MRSA). Id. It was  reported that Paulus's wife had MRSA. Id. Dr. Matsko observed "a couple of lesions on Paulus's face which were dried up (without any

---

13.    If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

11

drainage). Id. Paulus stated that he took some of his wife's Doxycycline[14] and suggested that is what dried up the lesions. Id. Paulus also reported that he smoked 1 pack of cigarettes per day. Id. Dr. Matsko noted that Paulus's medical history was "essentially benign" prior to this first appointment. Id. Other than evidence of a questionable healing lesion of the left side of his face, the objective physical examination findings reported by Dr. Matsko were normal. Id. It was reported that Paulus was normal neurologically and that his extremities were normal.[15] Dr. Matsko's diagnostic assessment was that Paulus suffered from "[c]hest pain of an undetermined etiology," "questionable MRSA exposure," and dyspnea. Id. Dr. Matsko ordered an EKG, a chest x-ray and appropriate MRSA laboratory studies. Id.

        The next record that we encounter is from about 5 months later. On April 16, 2008, Paulus had an appointment with Dr. Matsko regarding "evaluation and treatment of MRSA." Tr. 314. The subjective portion of the notes of this appointment state in pertinent part as follows: "He has been treated for [MRSA] for the past few months. He was exposed to this about a year and a half ago as well. Past personal history, social history, and family history and system review[16] were essentially unremarkable except in keeping with the present complaints." Id. The objective physical

14. Doxycycline (brand name Vibramycin) is a tetracycline antibiotic used to treat many different infections, including infections of the skin and urinary tract. Doxycycline, Drugs.com, http://www.drugs.com/doxycycline.html (Last accessed April 11, 2014).

15. A neurological examination generally includes testing of an individual's sensation, reflexes and motor strength.

16. "The review of systems (or symptoms) is a list of questions, arranged by organ system, designed to uncover dysfunction and disease." A Practical Guide to Clinical Medicine, University of California, School of Medicine, San Diego, http://meded.ucsd.edu/clinicalmed/ros.htm (Last accessed March 26, 2014).

examination findings reported by Dr. Matsko were normal except for "mild injection of the inner aspect of the left lower [eye]lid.". Id. It was reported that Paulus was normal neurologically and that his extremities were normal.[17]  The diagnostic assessment was that Paulus suffered from conjunctivitis[18] for which Dr. Matsko prescribed Erythromycin ophthalmic ointment and MRSA which Dr. Matsko noted was "under reasonable control as long as he takes [] Vibramycin[.]" Id. Dr. Matsko further stated that "hopefully he can return to work in June after this is totally resolved, that is what we are shooting for if he takes the medication faithfully." Id.

On May 29, 2008, Paulus had an appointment with Dr. Matsko "for evaluation and treatment of headaches, questionable MRSA which he has had in the past, shortness of breath, [] questionable P[e]yronies disease,[17] [and] excessive fatigue." Tr. 313.  Dr. Matsko noted that Paulus's personal, social and family history and systems review were unremarkable except in keeping with Paulus's  complaints just mentioned. Id.  The results of a physical examination were essentially normal. Id. The only adverse

---

17. Id.

18. "Conjunctivitis, also known as pinkeye, is an inflammation of the conjunctiva. The conjunctiva is the thin clear tissue that lies over the white part of the eye and lines the inside of the eyelid." Conjunctivitis (Pinkeye), WebMD, http://www.webmd.com/eye-health/eye-health-conjunctivitis (Last accessed April 11, 2014).

17. "Peyronie's disease is caused by scar tissue, called plaque, which forms along the length of the penis in the corpora cavernosa.  This plaque is not visible, and depending on the severity of the condition, the plaque can cause the penis to bend, making sexual intercourse difficult and occasionally painful. . . The cause of Peyronie's disease is unclear.  Many researchers believe the plaque of Peyronie's disease can develop following trauma (hitting or bending) that causes localized bleeding inside the penis." Erectile Dysfunction: Peyronie's Disease, WebMD, http://www.webmd.com/ erectile-dysfunction/guide/erectile-dysfunction-peyronies-disease (Last accessed April 11, 2014).

finding was a "small pustule on his testicle." Dr. Matsko diagnostic assessment was that Paulus suffered from "possible MRSA" and treated that condition with the antibiotic Bactrim.[18] Id. Dr. Matsko also indicated that Paulus suffered from fatigue and ordered laboratory studies; tobacco abuse and dyspnea and ordered a chest x-ray; and headaches which were noted to be most likely caused by seasonal allergies for which Paulus was prescribed a nasal steroid spray. Id.

On June 26, 2008, Paulus had a chest x-ray which revealed "[n]o active pulmonary disease. Tr. 330 and 378.

On July 24, 2008, Paulus had an appointment with Dr. Matsko who stated in the treatment notes of this appointment that he had not seen Paulus "for quite a period of time." Tr. 312. Dr. Matsko also noted Paulus's "significant testicular pain, anxieties, also questionable fractured right fifth finger, [] allergic rhinitis and headaches." Id. The result of a physical examination were essentially normal other than Dr. Matsko observed "[e]vidence of MRSA type healings with no active disease at the present time," some testicular tenderness bilaterally with mild swelling and a right third finger mallet type defect from a six-week old injury that could be either a fracture or tendon problem. Id. There were no neurological or extremity abnormalities noted other than with respect to the right third finger. Id. Dr. Matsko reported that Paulus's headaches were "pretty well improved at times with his nasal spray." Id. Dr. Matsko ordered an x-ray of the right third finger. Id. The x-ray was performed on July 31, 2008, and revealed "[n]o bony

18. "Bactrim contains a combination of sulfamethoxazole and trimethoprim [which] are both antibiotics that treat different types of infection caused by bacteria. [It] is used to treat ear infections, urinary tract infections, bronchitis, traveler's diarrhea, . . . [It] may be used for purposes not listed in the medication guide." Bactrim, Drugs.com, http://www.drugs.com/bactrim.html (Last accessed April 11, 2014).

14

abnormality in the right hand[.]" Tr. 295 and 329.  Also, on July 31, 2008, Paulus
underwent a scrotal ultrasound which revealed  "[r]ight-sided epididymal head cysts,[19] the
largest of which correspond[ed] to the palpable area of concern" and a "[s]mall right
hydrocele."[19] Tr. 297 and 328.  Blood collected on July 31, 2008, and cultured revealed
"[n]o growth in 5 days." Tr. 294.

On August 11, 2008, either a nurse, physicians assistant or secretary
working for Dr. Matsko spoke to Paulus and summarized the encounter as follows:
"Spoke to patient regarding employability assessment. As per doctor Matsko we can not
fill out forms [because] of testicular pain.  Dr. Matsko suggests that he see a urologist.
Michael said the he can't see a doctor [because] he doesn't have ins[urance].  I
suggested that he apply for medical assistance.  The paper work that he dropped off was
for disability for work not medical assistance. He said that he knew that he would be
denied [medical assistance]?" Tr. 311.

The next follow-up appointment with Dr. Matsko was on November 12,
2008. Tr. 310.  The results of a physical examination were essentially normal other than
the first blood pressure taken was 150/100 (the second 132/92); Paulus had tenderness

---

19.  "A spermatocele (epididymal cyst) is a painless, fluid-filled cyst in the long, tightly
coiled tube that lies above and behind each testicle. The fluid in the cyst may contain
sperm that are no longer alive.  It feels like a smooth, firm lump in the scrotum on top of
the testicle." Spermatocele (Epididymal Cyst) -Topic Overview, WebMD,
http://www.webmd.com/men/tc/spermatocele-epididymal-cyst-topic-overview (Last
accessed April 11, 2014).

19.  A hydrocele "is a painless buildup of watery fluid around one or both testicles
that causes the scrotum or groin to swell.  This swelling may be unsightly and
uncomfortable, but it usually is not painful and generally is not dangerous." Hydrocele -
Topic Overview, WebMD, http://www.webmd.com/parenting/baby/tc/hydrocele
-topic-overview (Last accessed April 11, 2014).

15

bilaterally in the testicles with questionable swelling; and he had some suprapubic tenderness. Tr. 310-311.   There were no abnormal findings with respect to Paulus's extremities. Id.   There were no abnormal neurological findings. Id.   Paulus was prescribed the antibiotic Bactrim for "[p]ossible MRSA." Id.   Dr. Matsko referred Paulus to a urologist for a consultation.   Id.   Throat/nasal samples collected on November 12, 2008, and cultured for 5 days revealed "rare" Staphylococcus aureus and the "isolate [was] beta-lactamase positive" making the bacteria resistant to penicillin and cephalosporin groups of antibiotics. Tr. 319.   The report of this culture stated that the bacteria present "may not relate to infection and may represent normal throat/nasal flora or colonization[.]" Id.

On December 8, 2008, Paulus was examined by Vanessa L. Elliott, M.D., a urologist at the Hershey Medical Center. Tr. 292-293.  Paulus's chief complaint was testicular pain which had worsened over the last few months. Tr. 292.   Dr. Elliott noted that other than the testicular pain and poor dentition Paulus was "fairly healthy." Id.   Dr. Elliott noted that Paulus was presently smoking 1 pack of cigarettes per day which he had been doing for 30 years. Id.   When Dr. Elliott reviewed Paulus systems, Paulus denied any changes in his gait. Tr. 293.  The results of a physical examination were normal other than a palpable epididymal cyst and testicular tenderness. Id.  Dr. Elliott ordered a repeat scrotal ultrasound and prescribed the narcotic drug Vicodin for pain. Id.

The ultrasound was performed on December 22, 2008, and revealed the epididymal cyst which was unchanged from the previous examination and "[p]ossible

16

early/small bilateral varicoceles."[20] Tr. 288. Paulus also had an appointment with Dr. Elliott on December 22, 2008. Tr. 289. After conducting a clinical interview, reviewing the results of the ultrasound and conducting a physical examination, Dr. Elliott's diagnostic assessment was that Paulus had symptoms and signs suggestive of prostatitis (an inflammation of the prostate gland often caused by infection). Id. Dr. Elliott prescribed a 4-week course of the antibiotic ciproflaxin as well as Uroxatral, a drug used to relax the muscles in the prostate and bladder neck, making it easier to urinate. Id. A follow-up appointment was scheduled for 4-6 weeks. Id. However, our review of the record did not reveal that Paulus had any further appointments with Dr. Elliot. A urine sample collected on December 22, 2008, and cultured for two days revealed no bacterial growth. Tr. 291.

On February 19, 2009, Paulus had an appointment with Dr. Matsko at which Paulus complained of a sinus infection, fatigue, dizziness, and a history of MRSA. Tr. 309. The results of a physical examination were normal other than subjective reports of testicular and epididymal pain. Id. There were no abnormal neurological or extremity findings recorded by Dr. Matsko. Id. Throat/nasal samples collected on February 19, 2009, and cultured for 5 days revealed "occasional" Staphylococcus aureus and the "isolate [was] beta-lactamase positive" making the bacteria resistant to penicillin and cephalosporin groups of antibiotics. Tr. 317 and 385. The report of this culture stated that the bacteria present "may not relate to infection and may represent normal throat/nasal flora or colonization[.]" Id.

---

20. "Varicoceles are enlarged varicose veins that occur in the scrotum." Varicocele Repair for Infertility, WebMD, http://www.webmd.com/infertility-and-reproduction /varicocele-repair-for-infertility (Last accessed April 11, 2014).

17

After about 4 months had elapsed, Paulus on June 16, 2009, had an appointment with Dr. Matsko at which Paulus complained of bacterial infections, dental problems, fatigue and testicular pain. Tr. 307. The results of a physical examination were normal other than evidence of tenderness in the left testicle and a "couple of lesions" which "appear[ed] to be cellulitis[21] in nature[.]" Id. There were no abnormal neurological or extremity findings recorded by Dr. Matsko. Id. Throat/nasal samples collected on June 16, 2009, and cultured for 4 days revealed "many" Staphylococcus aureus and the "isolate [was] beta-lactamase positive" making the bacteria resistant to penicillin and cephalosporin groups of antibiotics. Tr. 317 and 385. The report of this culture stated that the bacteria present "may not relate to infection and may represent normal throat/nasal flora or colonization[.]" Id.

On July 21, 2009, Paulus had an appointment with Dr. Matsko at which he complained of bilateral weakness of his legs, tenderness of his knees and shins, testicular pain, fatigue, mouth/dental pain and poor appetite. Tr. 306. The results of a physical examination were essentially normal. Id. No abnormal neurological or extremity findings were recorded by Dr. Matsko. Id. Dr. Matsko did note Paulus's poor dentition. Id. Dr. Matsko further noted that Paulus's MRSA was "under somewhat (sic) control at the present time." Id. Dr. Matsko ordered x-rays of Paulus's knees and lower legs. Id.

_____

21. Cellulitis is defined as "an acute, diffuse, spreading, edematous, suppurative, inflammation of the deep subcutaneous tissues and sometimes muscles, sometimes with abscess formation. It is usually caused by infection of a wound, burn, or other cutaneous lesion by bacteria, especially group A streptococci and Staphylococcus aureus, but it may also occur in immunocompromised hosts or following a [superficial form of cellulitis]." Dorland's Illustrated Medical Dictionary, 325 (32nd Ed. 2012).

Also, on July 21, 2009, Dr. Matsko completed a document entitled "Pennsylvania Department of Public Welfare Form" in which he stated in a conclusory fashion that Paulus was temporarily disabled from July, 2007 until December 1, 2009, and that Paulus was precluded from performing any gainful employment. Tr. 303. Dr. Matsko did not specify any work-related functional abilities, such as his ability to sit, stand, walk, lift or carry. Id. Dr. Matsko stated that Paulus's primary diagnosis was degenerative arthritis and abscessed teeth and his secondary diagnosis was MRSA. Id. Dr. Matsko did not point to any objective physical examination findings in the medical records supporting his assessment. Id.

X-rays of the left lower extremity performed on August 14, 2009, revealed a normal knee and lower leg bones. Tr. 326-327, 380 and 382. X-rays of the right lower extremity also performed on August 14, 2009, revealed a normal knee and lower leg bones. Tr. 324-325, 379 and 381.

Throat/nasal samples collected on September 22, 2009, and cultured for 2 days revealed "moderate" Staphylococcus aureus and the "isolate [was] beta-lactamase negative" making the bacteria susceptible to penicillin and cephalosporin groups of antibiotics. Tr. 387. The report of this culture stated that the bacteria present "may not relate to infection and may represent normal throat/nasal flora or colonization[.]" Id.

After the throat/nasal culture of September 22, 2009, there is an absence of medical treatment records for about six months. Throat/nasal samples collected on March 15, 2010, and cultured for 2 days revealed "moderate" Staphylococcus aureus and the "isolate [was] beta-lactamase negative" making the bacteria susceptible to penicillin and cephalosporin groups of antibiotics. Tr. 387. The report of this culture

19

stated that the bacteria present "may not relate to infection and may represent normal throat/nasal flora or colonization[.]" Id.

On May 3, 2010, Paulus had a series of x-rays of the cervical spine, thoracic spine, lumbar spine and pelvis. Tr. 353, 356-357 and 383. The x-rays of the cervical spine revealed "[m]inimal degenerative spurring in the lower cervical spine; moderate bilateral neural foraminal encroachment at the C5/C6 level; and no acute bony abnormality. Tr. 357. The x-rays of the thoracic spine revealed that the spinal alignment was normal; the intervertebral disc spaces and vertebral body height were well maintained; there were no fractures or subluxations;[22] the pedicles were intact; and there was no abnormal widening of the paravertebral soft tissues. Tr. 353. It was noted that the lateral view x-ray was somewhat limited because of a motion artifact. Id. However, three x-ray views were taken which we assume were the anterior, posterior and lateral views. Id. The x-rays of the lumbar spine revealed "[m]ild degenerative disc disease and degenerative joint disease at L4/L5 and L5/S1"[23] and "[n]o bony abnormality." Tr. 356.

---

22.   Subluxation is "an incomplete or partial dislocation." Dorland's Illustrated Medical Dictionary, 1791 (32nd Ed. 2012).

23.   The spine consists of several elements including vertebral bodies and intervertebral discs. The intervertebral discs (made of cartilage) are the cushions (shock absorbers) between the bony vertebral bodies that make up the spinal column. Each disc is made of a tough outer layer and an inner core composed of a gelatin-like substance.
    Degenerative disc disease is the wear and tear and breakdown of the intervertebral discs as a person grows older. It is a process that can result from the dehydration of the discs as well as an injury to the spine. The breakdown of the intervertebral discs can result in discs bulging, protruding or herniating as well as the inner gelatin-like core of the disc extruding outside the outer layer. These conditions sometimes obstruct the openings (foramen) along the spine through which nerve roots exit. This condition is known as neural foraminal narrowing or stenosis. They can also result in a narrowing of the spinal canal or spinal stenosis. Such bulges, protrusions and

(continued...)

There was "no evidence of spondylolysis[24] or spondylolisthesis."[25] Id. The x-rays of the pelvis were normal. Tr. 383.

Throat/nasal samples collected on July 26, 2010, and cultured for 3 days revealed "occasional" Staphylococcus aureus and the "isolate [was] beta-lactamase positive" making the bacteria resistant to penicillin and cephalosporin groups of antibiotics. Tr. 355. The report of this culture stated that the bacteria present "may not relate to infection and may represent normal throat/nasal flora or colonization[.]" Id. It was also noted that there was "no MRSA isolated from this specimen." Id.

On August 12, 2010, at the request of Dr. Matsko, Paulus had an appointment with Balint Balog, M.D., of the Orthopedic Institute of Pennsylvania regarding neck, thoracic and low back pain. Tr. 364-365. Dr. Balog noted that Paulus had achiness for years but that two weeks prior to the appointment Paulus was moving a couch and he allegedly had increased symptoms, including bladder incontinence. Tr. 364. The results of a physical examination were essentially normal other than he had a

---

23.   (...continued)
herniations if they contact nerve tissue can cause pain.
     Degenerative joint disease (or osteoarthritis) is a breakdown of the cartilage between joints. In the spine there are facet joints which are in the back of the spine and act like hinges. There are two superior (top) and two inferior (bottom) portions to each facet joint called the superior and inferior articular processes. These joints are covered with cartilage and the wear and tear of these joint is known as facet arthropathy (arthritis). This wear and tear of the facet joints result in loss of cartilage and can cause pain.

24.   A vertebra consists of several elements, including the vertebral body (which is the anterior portion of the vertebra), pedicles, laminae and the transverse processes. Spondylolysis is basically a stress fracture or breakdown of the components of a vertebra. See Dorland's Illustrated Medical Dictionary, 1754 (32nd Ed. 2012).

25.   A spondylolisthesis is a forward slip of one vertebra relative to another. Id.

wide-based gait; he had limited cervical flexion and extension but no crepitation with motion; he had moderate lumbar paraspinal tenderness; his lumbar extension was limited to 20 degrees (normal being 25 ); and he had some subjective tingling in the right periscapular region. Id. Paulus's lumbar forward flexion was within normal limits;[26] his reflexes were normal; he had unrestricted hip rotation; and he ambulated without an assistive device. Id. Dr. Balog opined that Paulus's symptoms suggested "possible cervical spinal stenosis or cervical spinal cord impingement" and he recommended further investigation of the cervical spine with an MRI scan. Tr. 365.

An MRI of the cervical spine performed on August 19, 2010, revealed a "[b]road-based disc osteophyte [spur] complex with mild central spinal canal narrowing" and "[s]evere bilateral neural foraminal narrowing" at the C6-C7 level. Tr. 351. On August 26, 2010, Dr. Balog, after conducting a clinical interview, reviewing the MRI scan and performing a physical examination of Paulus, opined that Paulus suffered from cervical radiculitis[25] with some symptoms suggestive of spinal cord compression. Tr. 363. Dr. Balog recommended that a neurosurgeon examine Paulus to determine whether surgical decompression was warranted. Id.

On September 28, 2010, Paulus was examined by Steven M. DeLuca, D.O., of the Orthopedic Institute of Pennsylvania based on a referral from Dr. Balog. Tr.

---

26. Normal lumbar spine flexion is from 80 to 105 degrees and extension 25 to 60 degrees. Normal Ranges of Motion Figures (in degrees), MLS Group of Companies, Inc., http://www.mls-ime.com/articles/GeneralTopics/Normal%20Ranges%20of% 20Motion.html (Last accessed March 26, 2014).

25. Radiculitis is defined as "inflammation of the root of a spinal nerve, especially that portion of the root which lies between the spinal cord and the intervertebral canal." Dorland's Illustrated Medical Dictionary, 1571 (32nd Ed. 2012).

361-362.   A physical examination performed by Dr. DeLuca revealed that Paulus was

awake, alert and oriented to person, place and time; he was in no acute distress; he had

some difficulty going from a sitting to standing position; he seemed to be unsteady on his

feet; he had a wide-based gait but not ataxic;[26] his neck range of motion was not

restricted; he had a negative Spurling's test;[26] he had a negative Lhermitte's test;[26] his

reflexes were normal in the upper extremities; he had a negative Hoffman's test;[27] he had

a negative inverted brachioradialis test;[28] he had diffusely weak strength in the bilateral

---

26.    Antalgic is defined as "counteracting or avoiding pain, as a posture or gait
assumed so as to lessen pain." Dorland's Illustrated Medical Dictionary, 97 (32nd  Ed.
2012). Ataxic (or atactic) is defined as "lacking coordination; irregular; pertaining to or
characterized by ataxia." Ataxia is defined as "failure of muscular coordination;
irregularity of muscular action." Id. at 170-171.

26.    The Spurling's test is an examination to determine whether a patient suffers from
cervical spondylosis or radiculopathy.  It is an "evaluation for cervical nerve root
impingement in which the patient extends the neck and rotates and laterally bends the
head toward the symptomatic side; an axial compression force is then applied by the
examiner through the top of the patient's head; the test is considered positive when the
maneuver elicits the typical radicular arm pain."  MediLexicon, Definition:'Spurling Test,"
http://www.medilexicon.com/medicaldictionary.php?t=90833 (Last accessed October
18, 2011).

26.    The Lhermitte's sign is defined as "the development of sudden transient, electric-
like shock spreading down the body when the patient flexes the head forward; seen
mainly in multiple sclerosis but also in compression and other disorders of the cervical
cord." Dorland's Illustrated Medical Dictionary, 1700 (32nd  Ed. 2012).

27.    The Hoffman's sign is a neurological sign in the hand which is suggestive of
spinal cord compression. The test involves tapping the nail on the third and fourth
finger. "The test is positive for spinal cord compression when the tip of the index finger,
ring finger, and/or thumb suddenly flex in response." Hoffman Sign: Red Flag for
Cervical Myelopathy, Orthopod,http://www.eorthopod.com/content/hoffmann-sign-red
-flag-for-cervical-myelopathy (Last accessed April 11, 2014).

28.    "An inverted brachioradialis reflex is associated with an absent biceps jerk and
an exaggerated triceps jerk.  It is indicative of a spinal cord lesion at C5 or C6 . . . ." GP
(continued...)

upper extremities; his reflexes in the lower extremities were normal; he had a normal

curvature of the lumbar spine; he was diffusely weak in the lower extremities; he had

normal sensation in the lower extremities; he had an inability to slide his right heel down

his left anterior tibia (shin bone) and vice versa; and he had slowness and some lack of

coordination with rapid finger movement. Id.  Dr. DeLuca's diagnostic assessment was

that Paulus suffered from "degenerative disc disease, spondylosis with mild spinal

stenosis at C6-7."[29] Tr. 362.  Dr. DeLuca also noted that there was a "possibility of spinal

cord compression within the thoracic and lumbar spine versus a brain abnormality such

as multiple sclerosis" which could be causing his alleged reports of fecal and urinary

incontinence. Id.  Dr. DeLuca recommended that Paulus undergo an MRI of the brain

and the thoracic and lumbar spines. Id.  However, Dr. DeLuca further stated that it was

his opinion that the mild central spinal stenosis at C6-C7 of the cervical spine was not

responsible for his current complaints especially the urinary and fecal incontinence. Id.

Dr. DeLuca prescribed Vicodin for pain. Id.

An MRI of the brain performed on October 9, 2010, was essentially normal.

Tr. 360 and 367.  On October 22, 2010, Dr. DeLuca wrote a "To Whom It May Concern"

letter (apparently to be brought to the attention of Paulus's insurance company) in which

---

28.   (...continued)
notebook, http://www.gpnotebook.co.uk/simplepage.cfm?ID=-1483079657 (Last
accessed April 11, 2014). A positive test would suggest cord or nerve root compression.

29.   Degeneration of the vertebrae and intervertebral discs is medically referred to as
spondylosis. Spondylosis can be noted on x-ray tests or MRI scanning of the spine as a
narrowing of the normal "disc space" between the adjacent vertebrae. The term is
frequently used to describe osteoarthritis of the spine. Stenosis can refer to the
narrowing of the neural foramen (the openings along each side of the spine through
which nerve roots exit) and also the spinal canal.

24

he reiterated that it was medical advisable that Paulus undergo an MRI of the thoracic spine as well as the lumbar spine to rule out spinal cord compression. Tr. 360. Also in that letter Dr. DeLuca noted that Paulus's cervical spine MRI dated August 19, 2010, "did not demonstrate much in the way of significant abnormality." Id.

On December 18, 2010, Paulus had an unremarkable thoracic spine MRI. Tr. 369. A lumbar spine MRI performed on the same day revealed at the L4-L5 level a disc protrusion extending into the right neural foramen causing severe narrowing and at the L5-S1 level a disc protrusion extending into the right neural foramen causing moderate narrowing. Tr. 370. There was no spinal canal stenosis. Id.

On January 3, 2011, Paulus was evaluated by William K. Daiber, D.O., a urologist. Tr. 373-374. After examining Paulus, Dr. Daiber concluded that he suffered from prostatic hyperplasia (enlargement of the prostate gland), chronic prostatitis and an epididymal cyst. Tr. 373. Dr. Daiber prescribed Cipro, an antibiotic, for 30 days. Tr. 374.

On January 13, 2011, Paulus had an appointment with Dr. DeLuca regarding his complaints of a "gait abnormality as well as bowel and bladder dysfunction." Tr. 393-394. The results of a physical examination were essentially normal. Tr. 393. Paulus gait was normal and his neck range of motion was not restricted. Id. He had a negative Spurling's test. Id. He had some weakness in the right deltoid and biceps as compared to the left and decreased sensation in the tips of the fingers on the right hand as compared to the left. Id. He also had some physiologic clonus (twitching/spasms of muscles) and hyporeflexia (decreased reflexes) in the lower extremities. Id. Dr. DeLuca reviewed the thoracic and lumbar MRIs with Paulus and indicated that they revealed no significant disc herniations or spinal stenosis. Tr. 393. Dr. DeLuca reported that he again

25

reviewed that cervical spine MRI of August 19, 2010. Tr. 394. It appears Dr. DeLuca slightly modified his opinion regarding that MRI because he reported that it demonstrated a rather large disc herniation at C6-C7 and caused a moderate degree of central stenosis and significant right neural foraminal stenosis as compared to the left. Id. He also stated that at the C5-C6 level there was very mild neuroforaminal stenosis. Id. Dr. DeLuca discussed with Paulus the risks and benefits of an anterior cervical discectomy and fusion at the C6-C7 level. Id. He also advised Paulus that if he opted for that surgery, he would have to stop smoking. Id.

On April 13, 2011, Paulus underwent a cervical discectomy and fusion. Tr. 392 and 417. After the surgery Paulus was transferred to the recovery room in a stable condition but had some difficulty with the overnight hospitalization. Tr. 417. In the middle of the night he became very hostile towards staff and refused to take medications. Id. He pulled out his IV. Id. It was opined that he was going through cigarette withdrawal symptoms or possibly withdrawal from illegal drugs. Id. There were several attempts made to calm him down. Id. Dr. DeLuca was contacted and he advised that it was acceptable to discharge Paulus from the hospital. Id. He had examined Paulus "late last evening" and Paulus was doing well. Id. Paulus had presented with 5/5 strength in the upper extremities and denied numbness and tingling. Id. Paulus also denied any difficulty swallowing. Id. Consequently, Paulus was discharged from the hospital on April 14, 2011. At the time of discharge Paulus was not seen by the attending physician because Paulus had exited the hospital and was standing in front of the hospital in his gown smoking a cigarette and did not wish to be disturbed. Id.

At some point the previous evening, April 13, 2011, Dr. DeLuca advised Paulus to wear a cervical collar for two weeks and advised him not to lift overhead or lift more than 10 pounds for six weeks. Tr. 392.

## Discussion

The administrative law judge at step one found that Paulus had not engaged in substantial gainful activity since June 1, 2007, the alleged onset date. Tr. 14.

At step two, the administrative law judge found that Paulus suffers from the following severe impairments: "high blood pressure, chronic herniated cervical disc, degenerative disc disease of the cervical and lumbar spine, and staph infection." Id.

At step three of the sequential evaluation process the administrative law judge found that Paulus's impairments did not individually or in combination meet or equal a listed impairment. Tr. 15.

In addressing step four of the sequential evaluation process in his decision, the administrative law judge found that Paulus could not perform his past unskilled to semi-skilled, medium to heavy work but that he could perform a limited range of light work. Tr. 15 and 19. Specifically, the administrative law judge found that Paulus could perform light works as defined by the regulations

> except he can lift/carry six pounds maximum; he can stand and walk 6 hours per 8-hour workday; he can sit 6 hour per 8-hour workday; he can do no overhead lifting with the bilateral upper extremities; he is limited to occasional climbing of stairs, bending, kneeling, stooping, crouching, and crawling; he is limited to occasional handling, fingering, and feeling with the dominant right hand; and he can tolerate no exposure to hazards such as unprotected heights and moving machinery.

Tr. 15. In setting this residual functional capacity for the relevant period - June 1, 2007, to the date of the administrative hearing - the administrative law judge considered

Paulus's credibility, past work and his activities of daily living, and the medical records and the opinions of the treating physicians. Tr. 15-19. The administrative law judge had to consider Paulus's reported symptoms and subjective complaints in light of the objective medical facts in the record and if his subjective complaints were not substantiated by the objective medical evidence the administrative law judge was required to make a finding as to the credibility of his complaints. The administrative law judge found that Paulus's statements concerning the intensity, persistence and limiting effects of his impairments were not credible to the extent that they were inconsistent with his ability to engage in the work as described above. Tr. 17. The administrative law judge when setting the residual functional capacity as noted above also considered Paulus's past work and his activities of daily living and the medical records covering the relevant time period. Tr. 16-19. The administrative law judge also rejected the opinion of Dr. Matsko who opined that Paulus was temporarily disabled from July, 2007, to December 1, 2009, because the opinion was conclusory in nature and provided no clinical findings in support of the opinion. Tr. 18.

At step five, the administrative law judge based on a residual functional capacity of a limited range of light work as described above and the testimony of a vocational expert found that Paulus had the ability to perform (1) unskilled, light work as a conveyor line bakery worker, (2) unskilled, sedentary work as a security system monitor, and (3) unskilled, sedentary work as a table worker (quality control), and that there were a significant number of such jobs in the local, state and national economies. Tr. 19-20 and 60-61.

The administrative record in this case is 421 pages in length and we have thoroughly reviewed that record. The administrative law judge did an excellent job of reviewing Paulus's vocational history and medical records in his decision. Tr. 12-20. Furthermore, the brief submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. Doc. 11, Brief of Defendant.

Paulus argues that the administrative law judge erred (1) by failing to find at step three of the sequential evaluation process that his impairments met or equaled a listed impairment, and (2) by proceeding to evaluate Paulus's claim at steps 4 and 5 of the sequential evaluation process. In substance there is only one issue raised by Paulus: whether or not Paulus's impairments met or equaled the requirements of a listed impairment. Based on our review of the record, we find no merit in Paulus's claim that the administrative law judge erred at step three of the sequential evaluation process.

Paulus's argument is premised on the contention that he met or equaled the requirements of Listing 1.04, Disorders of the Spine. Before we address the criteria/requirements of that listing we will mention some basic principles set forth in case law and the regulations of the Social Security Administration. If Paulus's severe impairments met or equaled a listed impairment, he would have been considered disabled per se and awarded disability benefits. However, a claimant has the burden of proving that his or her severe impairment or impairments meet or equal a listed impairment. Sullivan v. Zebley, 493 U.S. 521, 530 (1990); 20 C.F.R. § 1520(d) and § 416.920(d). To do this a claimant must show that all of the criteria for a listing are met or equaled. Id. An impairment that meets or equals only some of the criteria for a listed impairment is not sufficient. Id. Furthermore, the Commissioner's Listings contemplate

29

that findings satisfying the required criteria will be consistently documented over a period of time, not just on isolated examinations. 20 C.F.R., pt. 404, subpt. P, app. 1, § 1.00D ("Because abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation."); id. §1.00H(1)("Musculoskeletal impairments frequently improve with time or respond to treatment; [t]herefore, a longitudinal clinical record is generally important for the assessment of severity and expected duration of an impairment . . . .").

The determination of whether a claimant meets or equals a listing is a medical one.  The Social Security regulations require that an applicant for disability insurance benefits come forward with medical evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled."  20 C.F.R. § 404.1512(c). Consequently, a claimant must present medical evidence or opinion that his or her impairment meets or equals a listing.

To meet or equal the criteria of listings under section 1.04, a claimant must have a disorder of the spine resulting in compromise of the nerve root with 1) evidence of nerve root compression characterized by neuroanatomic distribution of pain, limitation of motion of the spine, motor loss and a positive straight leg raise (if there is lower back involvement), 2) confirmed spinal arachnoiditis, or 3) lumbar spinal stenosis with pseudoclaudication, established by imaging and manifested by chronic pain and weakness and resulting in the inability to ambulate effectively.  Paulus in his argument focuses on the cervical spine and argues that he is not claiming lower back involvement.

Consequently, the requirement of positive straight leg raise tests and an inability to ambulate effectively is irrelevant. Doc. 12, Plaintiff's Reply Brief, p. 3.

No treating physician submitted a functional assessment of Paulus which indicated that he was functionally impaired from a physical standpoint for the requisite continuous 12 month period.[30] Dr. Matsko's disability opinion was conclusory and did not specify any work-related functional limitations, such as limitations in Paulus's ability to sit, stand, walk, carry and lift. There is no medical opinion or evidence in the record that Paulus had nerve root compression characterized by neuroanatomic distribution of pain over a sufficient longitudinal period of time. In fact as our detailed review of the medical records revealed, when Paulus was examined by Dr. Matsko, Paulus repeatedly had normal neurological examinations. As for nerve root compression, the examination performed by Dr. DeLuca on September 28, 2010, revealed Paulus had a negative Spurling's test, Lhermitte's sign, Hoffman's sign and inverted brachioradialis reflex test. Also, on two occasions Dr. DeLuca reported that Paulus's cervical range of motion was not restricted. Tr. 361-362 and 393. Furthermore, neither Dr. Matsko nor Dr. DeLuca opined that Paulus's impairments met or equaled the criteria of Listing 1.04 and we cannot from the bare medical records conclude that his impairments met or equaled the criteria of Listing 1.04.

Paulus has proffered no medical opinion, nor has he marshaled the evidence in the record, to support his contention that his condition met or equaled the

30. To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).

requirements of Listing 1.04.  No treating or examining physician stated that Paulus's impairments met or equaled the criteria of Listing 1.04. Our review of the medical evidence pertaining to the period from June 1, 2007 through the date of the administrative hearing does not reveal evidence supporting a finding that he met Listing 1.04.  The administrative law judge gave an adequate explanation for finding that Paulus did not meet or equal the criteria of a listed impairment.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.

Robert D. Mariani
United States District Judge

Date: April /6, 2014